## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS,
## EASTERN DIVISION

| | |
|---|---|
| **MARCIN LANKAMER, as Independent Administrator of the Estate of Patryk Lankamer, deceased,** ) | |
| ) | |
| **Plaintiff**, ) | Civil Action No.: 1:24-cv-506 |
| -vs- ) | |
| ) | **JURY TRIAL DEMANDED** |
| **ANA LALLEY, THE CITY OF ELGIN, CRAIG REUTER, YOANA DAVALOS, DAVID MAHAN, DANIEL DIVELEY,** ) ) ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |
| **RANDY FRIES, STEVE ALCORN, GABRIELLE WILCHESKI, KATHERINE KIRSH, ALLISON REYNOLDS, SHAUN SCHROEDER,** ) ) ) ) | |
| ) | |
| **Respondents in Discovery.** ) | |

## COMPLAINT AT LAW

NOW COMES the Plaintiff, MARCIN LANKAMER, as Independent Administrator of the Estate of Patryk Lankamer, deceased, by and through his undersigned attorneys, CRAIG D. BROWN and NICHOLAS I. FLOWERS, and for his Complaint at Law against Defendants, ANA LALLEY, THE CITY OF ELGIN, CRAIG REUTER, YOANA DAVALOS, DAVID MAHAN, and DANIEL DIVELEY, states and alleges as follows:

### INTRODUCTION

1.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Patryk Lankamer's rights as secured by the Fourteenth Amendment of the United States Constitution.

2.     In January 2023, Patryk Lankamer (hereinafter "Patryk") was twenty years old. At that time, Patryk was hard-working high school graduate who had recently started working

1

as a package handler at FedEx.

3.     Patryk had a history of issues with law enforcement, including the Elgin Police Department, related to drugs and weapons.

4.     On January 20, 2023, Patryk was arrested on drug and weapons charges following a traffic stop in Elgin, Illinois.

5.     After his arrest, Elgin Police Department officers acted objectively unreasonably, failed to follow their own policies and procedures, and failed to properly protect Patryk from the harm he would encounter by virtue of his pre-trial detention.

6.     While detained, Patryk had in his possession a small plastic bag containing narcotics hidden in the exposed region of his perineum between his anus and scrotum. Elgin Police Department officers and employees failed to follow their own policies and procedures to adequately search Patryk and discover this contraband.

7.     During his detention, Patryk was exposed to the fentanyl through the thin barrier of skin in the perineum. As a result of the dermal exposure, Patryk suffered an overdose in his cell.

8.     Elgin Police officials ignored the obvious signs of Patryk's distress, made no reasonable efforts to supervise Patryk during his detention, and refused to provide adequate medical attention.

9.     At 4:51 AM on January 22, 2023, Defendant Craig Reuter found Patryk unresponsive in his cell. EMS pronounced Patryk dead in his cell at 5:48 AM.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this matter under the following:

a.      28 U.S.C. § 1331, as this is a civil action arising under the Constitution, laws, and/or treaties of the United States; and

b.      28 U.S.C. § 1343, as this is a civil action seeking to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom and/or usage, of a right, privilege or immunity secured by the Constitution of the United States and/or by an Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States.

11.     Plaintiff's claims for relief are predicated, in part, upon 42 U.S.C. § 1983, which authorizes actions to redress the deprivation, under color of state law, of rights, privileges, and immunities secured by the Constitution and laws of the United States, and upon 42 U.S.C. § 1988, which authorizes the award of attorneys' fees and costs to prevailing plaintiffs in actions pursuant to 42 U.S.C. § 1983.

12.     Plaintiff further invokes the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367, to consider the state law claims alleged herein.

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and § 1391(c), as Defendants do business in this judicial district and the events or omissions giving rise to the claims occurred in this judicial district.

**PARTIES**

14.     Patryk Lankamer, the decedent, was a twenty-year-old who was detained at the Elgin Police Department in Elgin, Illinois from January 20, 2023, until his death on January 22, 2023. Plaintiff, Marcin Lankamer, is Patryk's father and the duly appointed Independent Administrator of Patryk's estate.

3

15.     Defendant, Ana Lalley, is the Police Chief of the Elgin Police Department. At all times relevant to the events at issue in this case, Defendant Lalley was employed by the Elgin Police Department in her capacity as Police Chief. At all times material herein, Defendant Lalley was acting under the color of law and promulgated rules, regulations, policies, and procedures as the Police Chief of the Elgin Police Department for the provision of certain operating procedures by Elgin Police Department officials at the Elgin Police Department jail. She is sued here in her official capacity.

16.     Defendant, City of Elgin, is a city of the State of Illinois. It is an Illinois municipal corporation that operates the Elgin Police Department, which, in turn, operates the Elgin Police Department jail.

17.     Defendants Craig Reuter ("Reuter"), Yoana Davalos ("Davalos"), David Mahan ("Mahan"), and Daniel Diveley ("Diveley") were employees of the Elgin Police Department during the relevant period. At all times relevant to the events at issue in this case, these defendants were acting under the color of law and within the scope of employment with the Elgin Police Department. These defendants are sued in their individual capacity.

## FACTUAL ALLEGATIONS

### Timeline of Events

18.     On January 20, 2023, at or around 8:30 PM, Officers Mahan and Diveley stopped a vehicle occupied by Patryk at the intersection of N Melrose Avenue and Larkin Avenue in Elgin, Illinois.

19.     On January 20, 2023, Officers Mahan and Diveley were on patrol monitoring an area with known drug trafficking activity. Officers Mahan and Diveley witnessed a vehicle pull into the driveway of a known drug house and engage in activity which the officers believed

4

was consistent with a "hand to hand" drug transaction.

20.     Officers Mahan and Diveley followed the vehicle for a short distance before stopping the vehicle after it allegedly failed to come to a complete stop at a stop sign.

21.     The occupants of the vehicle included Patryk and two other male passengers, both of whom were under the age of twenty-one years old.

22.     Upon pulling over the vehicle, Officers Mahan and Diveley claim to have discovered a strong odor of marijuana coming from the car. Officers Mahan and Diveley determined that they had probable cause to search the vehicle based on the odor of marijuana, minors suspected of being in possession of tobacco products, and the apparent criminal activity observed prior to the stop.

23.     Officers Mahan and Diveley removed the occupants from the vehicle and performed a search of the vehicle during which they located three firearms, ammunition, a baggie containing a substance officers suspected and later confirmed to be cocaine, three torn plastic baggies which Office Mahan stated was consistent with the practice of packaging narcotics for individual sale, and an empty alcohol container. Additionally, Officers Mahan and Diveley found $4,877 in cash in Patryk's front pants pocket.

24.     Following the discovery of contraband, Officer Schroeder performed a pat down search of Patryk over his clothes and did not discover any further contraband on Patryk's person.

25.     Patryk and the two other occupants were subsequently arrested and brought to the Elgin Police Department Jail as pre-trial detainees for booking.

26.     At that time, Officers Mahan and Diveley suspected Patryk Lankamer of engaging in drug trafficking given the circumstances surrounding the stop and the large sum of money

found on his person.

27.     Based upon their training and experience, Officers Mahan and Diveley knew or should have known that it was likely that Patryk had purchased a significant quantity of narcotics during the "hand to hand" transaction they observed which served as the basis for their stop.

28.     Based upon their training and experience, Officers Mahan and Diveley knew or should have known that offenders, similar to Patryk, commonly hide narcotics or other small contraband on their person in an attempt to prevent the discovery of such contraband.

29.     Based upon their training and experience, Officers Mahan and Diveley knew or should have known that it was likely that Patryk was in possession of additional narcotics other than what was discovered in Patryk's vehicle.

**The Setting and Institutional Knowledge at the time of Patryk's Detention**

30.     At the time of Patryk's detention, it was widely known throughout the correctional field and extensively documented that deaths due to drug overdose were a leading cause of death inside jails. A study released by the U.S. Department of Justice in 2021 found that the number of deaths in local jails due to drug or alcohol intoxication has more than quadrupled between 2000 and 2018. See U.S. Dep't of Justice, Bureau of Justice Statistics, *Mortality in Local Jails and State Prisons, 2000-2018 – Statistical Tables*, April 2021 (available at https://bjs.ojp.gov/content/pub/pdf/mlj0018st.pdf).

31.     The Elgin Police Department Annual Report for 2021 found that there were 100 drug-related overdoes in Elgin in 2021, all but one of which involved opiates, like fentanyl. See Elgin Police Department, *Annual Report 2021* (available at https://il-elgin4.civicplus.com/1454/Crime-Statistics).

32.     Data maintained and published by the Illinois Department of Public Health shows that synthetic opioid overdose deaths have increased by 2,736% between 2013 and 2020, making death from opioid intoxication 2.3 times more likely than death due to a car accident. See Illinois Department of Public Health, *Opioids, Data and Reporting, IDPH Opioid Data Dashboard* (available at https://dph.illinois.gov/topics-services/opioids/idph-data-dashboard.html).

33.     At all relevant times, the Elgin Police Department and decision-making Defendant Ana Lalley were aware of the aforementioned data related to the prevalence of opioid-related overdoses in and around Elgin, including those inside jails.

**Timeline of Events Continued**

34.     When Patryk was detained and booked at the Elgin Police Department on the night of January 20, 2023, it was the duty of the Elgin Police Department and its police officers, including Officers Mahan and Diveley, to perform a strip search on Patryk to locate narcotics or other small contraband for his safety as well as the safety of others.

35.      At all times material, no strip search of Patryk was performed.

36.     Based on the facts of the present arrest, prior encounters with Patryk, and Patryk's criminal record, which was known or should have been known to the Elgin Police Department and Officers Mahan and Diveley, Patryk was known drug user.

37.     As was known or should have been known to the Elgin Police Department and Officers Mahan and Diveley, on January 1, 2023, Patryk was arrested and charged in Elgin with unlawful marijuana possession by a minor, along with a charge for resisting arrest and other traffic citations.

38.     Despite the Elgin Police's knowledge of Patryk's past suspected drug use and

possession three weeks prior, and his current arrest for narcotics and weapons possession, and a substantial amount of cash on his person, Elgin Police officers never performed a strip search on Patryk.

39.     Officer Diveley's cursory search over Patryk's clothes was objectively unreasonable under the circumstances and insufficient to discover the contraband located on Patryk's person.

40.     Elgin Police Department's policies and procedures failed to provide sufficient training, direction, and supervision to its officers and staff to clearly delineate the circumstances under which it was necessary to perform strip searches.

41.     Elgin Police Department failed to implement and enforce the necessary policies and procedures requiring its detainees, including Patryk, to be properly searched upon detention to ensure their protection.

42.     On January 21, 2023, after Officer Diveley performed a cursory search of Patryk, Patryk was booked and placed in a holding cell by Officer Mahan and Defendant Reuter at or around 3:53 AM.

43.     On the morning of January 21, 2023, the other two young male occupants of Patryk's vehicle were released on bond following a bond hearing.

44.     Patryk's bond hearing was also scheduled for that morning.

45.     After being removed from his holding cell and brought to the bond call room on two occasions, Patryk's bond call was delayed until Sunday January 22, 2023, as a result of the Kane County Assistant State's Attorney's request for Officers Mahan and Diveley to update portions of their arrest report.

46.     At or around 10:27 AM on January 21, 2023, Patryk was returned to cell M-3 and

was to be held until his bond call the following morning.

47.     From that time until 10:45 PM on January 21, 2023, Officer Davalos, a Community Service Officer stationed at the Elgin Police Department jail, was tasked with processing incoming detainees and monitoring detainees in custody, including Patryk.

48.     Elgin Police Department policies and procedures required Community Service Officers like Defendants Davalos and Reuter to perform cell checks to visually observe adult detainees every thirty minutes and to keep an Officer Activity Log which includes time stamps for cell checks and remarks about the inmates based on those cell checks.

49.     At or around 1:56 PM on January 21, 2023, Defendant Davalos performed a cell check and observed Patryk asleep in his cell.

50.     For the remainder of her shift, Defendant Davalos observed Patryk sleeping, non-responsive, and in the identical position during each cell check.

51.     At or around 6:49 PM on January 21, 2023, Officer Davalos delivered a meal from Burger King to Patryk in cell M-3. Officer Davalos opened the small, locked gate on the cell door and knocked on the door several times in an attempt to awaken Patryk and notify him of the meal.

52.     Patryk, however, remained asleep and non-responsive despite the knocking on the cell door and the delivery of dinner. Despite knowing that Patryk had been arrested for charges including possession of narcotics and had been non-responsive for several hours, Officer Davalos did not make any further attempt to awaken Patryk or check on his condition.

53.     At or around 10:45 PM on January 21, 2023, a shift change occurred. Defendant Davalos ended her shift and Defendant Reuter started his shift. Defendant Reuter assumed the role of processing incoming detainees and monitoring detainees in custody, including Patryk.

9

54.     Beginning at or around 10:50 PM on January 21, 2023, Defendant Reuter was the Community Service Officer tasked with monitoring the detainees in custody. At that time, Patryk and one other detainee were being held in custody.

55.     At the start of Defendant Reuter's shift, he conducted a headcount to determine how many detainees were in the holding cells. Similar to Defendant, Davalos, he found Patryk asleep and non-responsive in cell M-3 and made no attempt to wake him or check on his condition.

56.     Between 10:50 PM and 4:20 AM, Defendant Reuter performed cell checks roughly every thirty minutes. Defendant Reuter's cell checks merely involved looking inside Patryk's cell to confirm his presence.

57.     Defendants Davalos and Reuter were purportedly trained to look for "signs of life" during cell checks. Defendant City of Elgin and Defendant Chief Ana Lalley failed to properly train Defendants Davalos and Reuter to properly identify the signs of life-threatening medical conditions, including drug overdoses, despite the common institutional knowledge of the staggering rise in drug overdoses in and around Elgin, including in local jails.

58.     At or around 2:22 AM on January 22, 2023, Defendant Reuter performed a cell check and removed the untouched dinner that Defendant Davalos had delivered to Patryk's cell almost eight hours earlier at 6:49 PM the previous day.

59.     After removing Patryk's untouched dinner, Defendant Reuter made no attempt to determine if Patryk was in medical distress despite knowing that Patryk had been arrested for charges including possession of narcotics, that Patryk had been asleep and non-responsive for more than twelve hours, and that Patryk had not eaten since being arrested nearly 30 hours earlier.

60.     At or around 4:51 AM on January 22, 2023, Defendant Reuter conducted a cell check and observed Patryk in his cell. Defendant Reuter knocked on Patryk's door but did not hear a response. Defendant Reuter shouted Patryk's name but received no response. After two minutes, Defendant Reuter walked away from Patryk's cell.

61.     At or around 4:54 AM on January 22, 2023, Defendant Reuter returned to the cell to further observe Patryk. After another minute of observation and attempting to wake up Patryk, Defendant Reuter walked away from Patryk's cell.

62.     At or around 4:56 AM on January 22, 2023, Defendant Reuter returned to the cell for a third time within several minutes. Given Patryk's failure to respond, Defendant Reuter finally entered Patryk's cell at 4:57 AM. Inside the cell, Defendant Reuter observed Patryk laying in the cell bed, on his back, with vomit coming out of his mouth. Patryk appeared flushed with no color in his face. Patryk did not respond or move when Defendant Reuter entered the cell and attempted to wake him. At 4:58 AM, Defendant Reuter left and locked the cell.

63.     Defendant Reuter returned to the jail office and called Officer Fries to inform him that Patryk was found unresponsive. Defendant Fries advised Defendant Reuter that he would come to the jail and that Reuter should immediately request an ambulance. Over the radio, Defendant Fries instructed other officers to respond to the jail.

64.     At or about 5:00 AM on January 22, 2023, Defendant Reuter returned to Patryk's cell and performed a sternum rub on Patryk. Patryk remained unresponsive. Surveillance footage shows Defendant Reuter's multiple trips to Patryk's cell at and around 5:00 AM on January 22, 2023.

65.     The Elgin Police Department and its officers, including Defendants Davalos and

11

Reuter, failed to take timely and appropriate action to ensure Patryk's well-being as soon as Patryk became non-responsive. Defendants Davalos and Reuter consciously disregarded Patryk's safety by not checking on his condition at any time prior to approximately 4:58 AM on January 22, 2023, and in failing to request medical assistance for Patryk prior to that time.

66.     After Patryk became unresponsive, Defendants Davalos and Reuter along with other Elgin Police Department officials exhibited a conscious disregard for Patryk's well-being by failing to check on his condition, failing to request medical personnel to check on his condition, and in otherwise failing to perform adequate cell checks prior to approximately 4:58 AM on January 22, 2023.

67.     Defendant Davalos, Reuter, and other Elgin Police Department officials were able to observe Patryk laying on his back with vomit covering his face and non-responsive each time they performed a check of his cell, but exhibited a conscious disregard for Patryk, resulting in Patryk being deprived of the necessary medical treatment, including the administration of Narcan, to ensure his well-being.

68.     Narcan, generically Naloxone, is a fast-acting, life-saving drug which reverses opioid-involved overdoses. Centers for Disease Control and Prevention, *Lifesaving Naloxone*, (available at https://www.cdc.gov/stopoverdose/naloxone/index.html).

69.     It is widely known within the First Responder and Law Enforcement community that the timing of the administration of Narcan in opioid-involved overdoses is often a matter of life and death. New York State Division of Criminal Justice Services, *Opioid Overdose and Intranasal Naloxone Training for Law Enforcement Participant Manual*, August 2014 (available at https://bjatta.bja.ojp.gov/system/files/naloxone/NY%20State%20Opioid%20Overdose%20and%20Intranasal%20Naloxone%20Training%20-%20Participant%20Manual.pdf).

12

70.     Finally, at or around 5:02 AM, Officer Fries, along with Officer Alcorn and Kirsh, arrived with medical equipment to render aid to Patryk.

71.     At this time, Patryk was still laying supine in the cell bed with vomit covering the right side of his head and mouth and he was not breathing. Officer Fries attempted to find a pulse on Patryk but could not find one and moved Patryk's body to the floor.

72.     After being unable to locate a pulse, Officers Fries and Alcorn instructed Defendant Reuter to call for an ambulance. At 5:02 AM, the Elgin Fire Department was called, and an ambulance was dispatched to the jail.

73.     After calling for an ambulance, Officers Fries and Alcorn administered Naloxone to Patryk, attempted chest compression with breaths, and attached the AED.

74.     Upon their arrival at approximately 5:09 AM, eighteen minutes after Defendant Reuter initially noticed Patryk was unresponsive, paramedics from the Elgin Fire Department took over efforts to treat and revive Patryk.

75.     At 5:48 AM, Elgin Fire Department personnel declared Patryk dead.

76.     Given the unusual circumstanced surrounding Patryk's death while under the care and control of the Elgin Police Department, an autopsy was performed by the Kane County Coroner which revealed two small plastic baggies located in Patryk's perineum.

77.     It was determined that the two small plastic baggies in Patryk's perineum contained .3 grams cocaine and 5 grams of fentanyl.

78.     The Kane County Coroner determined that Patryk died from fentanyl and cocaine intoxication over the course of hours or minutes.

79.     The Coroner's Report indicated that Patryk's blood included 170 ng/mL of Benzoylecgonine, an inactive metabolite and chemical breakdown product of cocaine, and 15

ng/mL of Fentanyl. According to the reference comments in the Coroner's Report, the range of concentrations of Benzoylecgonine in cocaine related deaths was 700-31000 ng/mL, while the range of concentrations of Fentanyl was variable with the lowest reported concentration as 3 ng/mL.

80.     According to the findings of fact in the Coroner's Report Patryk died only from a fentanyl overdose.

81.     The Coroner's Report did not note or identify any powdered substance in Patryk's nose or mouth.

82.     Patryk was exposed to the fentanyl and cocaine over the course of his detention as both can be absorbed by the human body through exposure to the skin if the exposure occurs over a long period of time, such as during Patryk's detention while the drugs were located in his perineum.

83.     According to the Center for Disease Control ("CDC"), dermal exposure to fentanyl results in absorption over hours to days.

([https://www.cdc.gov/niosh/ershdb/emergencyresponsecard_29750022.html#:~:text=Fentanyl%20is%20estimated%20to%20be,a%20person's%20ability%20to%20function](https://www.cdc.gov/niosh/ershdb/emergencyresponsecard_29750022.html#:~:text=Fentanyl%20is%20estimated%20to%20be,a%20person's%20ability%20to%20function)).

84.     According to the CDC, dermal exposure to fentanyl can cause, among other issues, reduced levels of consciousness, lethargy, reduced respiratory function, hypoxia, coma, and death.

([https://www.cdc.gov/niosh/ershdb/emergencyresponsecard_29750022.html#:~:text=Fentanyl%20is%20estimated%20to%20be,a%20person's%20ability%20to%20function](https://www.cdc.gov/niosh/ershdb/emergencyresponsecard_29750022.html#:~:text=Fentanyl%20is%20estimated%20to%20be,a%20person's%20ability%20to%20function)).

85.     Patryk died from a fentanyl overdose, caused by dermal exposure over the course of hours and potentially days.

86.     As the individual responsible for implementing and enforcing the necessary policies and procedure to keep detainees such as Patrick safe, Defendant Lalley, knew or should have known of the prevalence of opioids in jails and ensured that adequate pre-trial detainee processing and overdose prevention policies were in place.

87.     Elgin Police Department employees consistently refuse to comply with promulgated policies including 71.1 Transportation of Detainees, Detainee Process & Health Care Services 72.4, Detainee Rights and Supervision 72.5, and Temporary Detention Cells/Interview Rooms 72.6, including Defendants Mahan, Diveley, Davalos and Reuter from January 20, 2023, through January 22, 2023.

88.     Elgin Police Department does not maintain any reasonable system of supervision to enforce policies and procedures related to the safety and well-being of pre-trial detainees. Officers, including Defendants Mahan, Diveley, Davalos and Reuter from January 20, 2023, through January 22, 2023, routinely violate these policies and procedures without consequence.

89.     Elgin Police Department failed to institute policies and/or adequately train its officers, including Defendants Mahan, Diveley, Davalos and Reuter, to perform adequate searches on arrestees and detainees who are suspected of possessing illegal narcotics.

90.     Elgin Police Department failed to institute policies and/or adequately train its officers, including Defendants Davalos and Reuter, to properly monitor detainees.

91.     Elgin Police Department failed to institute polices and/or adequately train its officers, including Defendants Davalos and Reuter, to promptly identify and respond toemergency medical conditions including accidental opioid overdoses.

92.     Defendant Lalley, as Police Chief, supervised and managed all aspects of the Elgin Police Department, including the jail. Defendant Lalley was aware of the increasing

deaths due to drug overdoses and the City of Elgin and State of Illinois's rising opiate overdose epidemic. Defendant Lalley was also aware that Elgin Police Department officials, including Defendants Reuter, Davalos, Mahan, and Diveley routinely failed to abide by the Elgin Police Department policies and procedures, including, but not limited to:

    a.  Failing to properly search detainees to ensure that any contraband possessed by the detainee is seized in violation of 72.6.5 (A), 72.4.1(A).

        i.  72.6.5 (A) requires the detainee and cell to be searched for contraband, weapons, or dangerous items.

       ii.  72.4.1(A) requires detainees to be properly searched when arriving in the booking area.

    b.  Failing to properly monitor detainees during their detention in holding cells in violation of 72.6.3 (B).

        i.  72.6.3 (B) requires detainees to be visually observed every thirty minutes with documentation of the visual observation.

    c.  Failure to identify and promptly administer necessary first aid and/or request medical services, including ambulances, to a detainee experiencing a visible serious medical emergency in violation of 72.4.9 (B), (E).

        i.  72.4.9 (B) requires an officer or jailer who discovers a detainee with visible serious injuries or illness to immediately summon an ambulance.

       ii.  72.4.9 (E) requires officers and jailers to render first aid and request medical services when needed.

93.    Defendant Lalley was aware of these habitual refusals and/or failures by Elgin Police Department officials, including Defendants Reuter, Davalos, Mahan, and Diveley to

comply with the Department's policies and procedures of the Department, but failed to take any action to ensure that all policies and procedures were understood and complied with at all times.

## COUNT I
### Failure to Protect in Violation of the Fourteenth Amendment under 42 U.S.C. § 1983

94.     Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

95.     Count I of this Complaint is brought against Defendants Reuter, Mahan, and Diveley.

96.     Under settled United States Supreme Court authority, and in accordance with the Fourteenth Amendment, Patryk was entitled to be free from a known and unreasonable risk of serious harm while in the custody of the Elgin Police Department.

97.     In violation of the Fourteenth Amendment, these Defendants knew of and disregarded a substantial risk of serious harm—that Patryk was in possession of narcotics to which he would be exposed and that these narcotics posed a potentially life-threatening condition to Patryk.

98.     These Defendants' actions were objectively unreasonable given their training, experience, and knowledge of the circumstances surrounding Patryk's arrest, his prior criminal record, and his appearance in the jail.

99.     These Defendants' actions and omissions were undertaken with malice and/or reckless disregard for Patryk's constitutional rights.

100.     As a result of the unjustified and unconstitutional conduct of these Defendants, Patryk experienced pain, suffering, emotional distress, injury, and ultimately, death.

101.     Defendants Reuter, Officer Mahan, and Officer Diveley's actions and omissions

were the direct and proximate cause of the violations of Patryk's constitutional rights, his death, and the damages suffered by his heirs, including the loss of Patryk's society, companionship, affection, education, and training.

## COUNT II
### Failure to Protect in Violation of the Fourteenth Amendment under 42 U.S.C. § 1983

102.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

103.    Count II is brought against Defendants Reuter and Davalos.

104.    Pursuant to United States Supreme Court authority, and in accordance with the Fourteenth Amendment, Patryk was entitled to be free from a known and unreasonable risk of serious harm while in the custody of the Elgin Police Department.

105.    In violation of the Fourteenth Amendment, these Defendants knowingly ignored and refused to protect Patryk from a substantial risk of serious harm, a fentanyl overdose, while Patryk was detained and unresponsive for more than twelve hours.

106.    These Defendants' actions and inaction were objectively unreasonable considering the clear signs and symptoms of the drug overdose that Patryk was experiencing.

107.    These Defendants' above-described actions and omissions were undertaken with malice and/or reckless disregard for Patryk's constitutional rights.

108.    As a result of the unjustified and unconstitutional conduct of these Defendants, Patryk experienced pain, suffering, emotional distress, injury, and ultimately, death.

109.    Defendants Reuter and Davalos' actions and omissions were the direct and proximate cause of the violations of Patryk's constitutional rights, of his death, and of the damages suffered by his heirs.

## COUNT III
### *Monell* Claim under 42 U.S.C. § 1983

110.   Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

111.   Count III is brought against Defendant Police Chief Lalley in her official capacity and the City of Elgin.

112.   The Elgin Police Department does not have an adequate drug overdose prevention policy nor does the Department ensure its current policies are understood and enforced.

113.   During the relevant period, Defendant Lalley had notice of widespread practices by employees at the Elgin Police Department by which officials routinely failed to properly identify, search, and monitor detainees who were at risk of drug overdoses during their detention. These widespread practices are a result of the lack of adequate formal policies, training, and supervision aimed at protecting detainees from the risk of drug overdoses.

114.   The widespread practices of the Department's officials became so well-settled so as to constitute de facto policy of the Elgin Police Department given Chief Lalley's deliberate indifference to the rights of detainees, thereby effectively ratifying such disregard for the rights of detainees.

115.   Patryk's injuries, and ultimately his death, were caused in substantial part by these widespread policies, practices, procedures, actions, inactions, and indifference to the rights of detainees promulgated by the Elgin Police Department.

116.   The City of Elgin, through the Elgin Police Department, had actual knowledge of Patryk's high risk of serious injury and death while he was detained due to his prior criminal history and the circumstances surrounding his arrest.

**COUNT IV**
**State Law Claim for Wrongful Death**

117.     Plaintiff repeats and realleges the preceding paragraphs as if full set forth in this Count.

118.     Count IV is brought against all the individual Defendants.

119.     As described more fully in the preceding paragraphs, the individual Defendants knew or should have known that Patryk had concealed illegal contraband, including narcotics, on his person, was at high risk of serious injury as a result of exposure to the illegal contraband, and should be monitored closely, but failed to properly monitor him or provide adequate medical attention and aid, resulting in Patryk's wrongful death.

120.     As detailed above, the individual Defendants consciously disregarded Patryk's safety by failing to properly search Patryk during the arrest and intake process, failing to properly monitor Patryk during his detention, failing to identify that Patryk was experiencing an overdose and medical emergency, and failing to take any action to provide medical care and assistance.

121.     By and through their acts and omissions, the individual Defendants breached their duty to provide for Patryk's health and safety and were a proximate cause of Patryk's death and the injuries to his heirs.

122.     The individual Defendants' above-described actions and omissions were objectively unreasonable and undertaken with malice and/or reckless disregard for Patryk's rights.

123.     Plaintiff, as Independent Administrator of Patryk's estate, claims damages for the wrongful death of Patryk and for the loss of his services, protection, care, future income, assistance, society, companionship, comfort, guidance, counsel and advice, as well as for the

mental anguish caused by this loss, as well as for funeral and other expenses and damages

pursuant to 740 ILCS 180/1, commonly referred to as the Illinois Wrongful Death Act.

## COUNT V
### State Law Claim for Respondeat Superior

124. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this

County.

125. Count V is brought against Defendant Police Chief Lalley in her official capacity.

126. In committing the acts alleged in the preceding paragraphs, the Individual

Defendants were employees, members, and agents of the Elgin Police Department, acting at all

relevant times within the scope of their respective employment with Elgin.

127. Defendant Lalley is liable as principal for all torts committed by her agents.

## COUNT VI
### State Law Claim for Indemnification

128. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this

County.

129. Count VI is brought against the Defendant City of Elgin.

130. Illinois law provides that public entities are directed to pay any tort judgment for

compensatory damages for which employees are liable within the scope of their employment

activities.

131. The individual Defendants were employees of the Elgin Police Department who

acted within the scope of their employment in committing the misconduct described above.

132. The City of Elgin is obligated to pay any judgment entered against Defendant

Police Chief Lalley in an official capacity.

## **DESIGNATION AS RESPONDENTS IN DISCOVERY**

NOW COMES the Plaintiff, Marcin Lankamer, as Independent Administrator of the Estate of Patryk Lankamer, deceased, by and through his attorneys, MEYERS & FLOWERS, LLC, and for his Designation as Respondents in Discovery, states as follows:

1.  The Plaintiff, MARCIN LANKAMER, as Independent Administrator of the Estate of Patryk Lankamer, deceased, files the above cause of action against Defendants, ANA LALLEY, THE CITY OF ELGIN, CRAIG REUTER, YOANA DAVALOS, DAVID MAHAN, and DANIEL DIVELEY, stemming from the death of Patryk Lankamer while in custody of the Elgin Police Department on January 22, 2023.

2.  Plaintiff hereby repeats and re-alleges the allegations set forth in the above Complaint at Law as though fully set forth herein.

3.  It is believed by the Plaintiff that RANDY FRIES, STEVE ALCORN, GABRIELLE WILCHESKI, KATHERINE KIRSH, ALLISON REYNOLDS, SHAUN SCHROEDER all have information essential to the determination of who should properly be named as additional defendants in this action and as such hereby designates RANDY FRIES, STEVE ALCORN, GABRIELLE WILCHESKI, KATHERINE KIRSH, ALLISON REYNOLDS, SHAUN SCHROEDER as Respondents in Discovery in Accordance with 735 ILCS 5/2-402.

WHEREFORE, Plaintiff, MARCIN LANKAMER, As Independent Administrator of the Estate of Patryk Lankamer, deceased, requests that RANDY FRIES, STEVE ALCORN, GABRIELLE WILCHESKI, KATHERINE KIRSH, ALLISON REYNOLDS, SHAUN SCHROEDER be designated as Respondent in Discovery in accordance with 735 ILCS 5/2-402.

## PRAYER FOR RELIEF

**WHEREFORE,** the Plaintiff, Marcin Lankamer, as Independent Administrator of the Estate of Patryk Lankamer, deceased, respectfully demands that this Honorable Court enter judgment against the Defendants Craig Reuter, Yoana Davalos, David Mahan, and Daniel Diveley in a dollar amount to satisfy the jurisdictional limitation of this Court and for such additional amounts as the Court shall deem proper and just, and additionally, costs of said suit.

## <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury.

Marcin Lankamer

MEYERS & FLOWERS, LLC

Craig Brown, one of his Attorneys

Craig D. Brown (#6210554)
Nicholas Flowers (#6345661)
MEYERS & FLOWERS, LLC
3 North Second Street, Suite 300
St. Charles, Illinois 60174
Phone: (630) 232-6333
Fax: (630) 845-8982
cdb@meyers-flowers.com
nif@meyers-flowers.com