**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

MARCIN LANKAMER, as Independent )
Administrator of the Estate of Patryk )
Lankamer, deceased, )
                          )
         Plaintiff, )
                          )       No. 24 C 506
       v. )
                          )       Judge Sara L. Ellis
ANA LALLEY, THE CITY OF ELGIN, )
CRAIG REUTER, YOANA DAVALOS, )
DAVID MAHAN, DANIEL DIVELEY, )
                          )
         Defendants. )

## OPINION AND ORDER

Plaintiff Marcin Lankamer, as independent administrator of the Estate of Patryk

Lankamer (the "Estate"), sued Officers Craig Reuter, Yoana Davalos, David Mahan, and Daniel

Diveley (the "Individual Defendants") under 18 U.S.C. § 1983, alleging that the Individual

Defendants caused Patryk Lankamer's death while in pre-trial detention by failing to search him

for drugs hidden on his body and failing to provide proper medical care. Further, the Estate

seeks to hold the City of Elgin (the "City") and Police Chief Ana Lalley liable pursuant to

*Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), for failing

to train its police officers to properly search detainees for drugs and monitor detainees for drug

overdoses during their detention. Finally, the Estate brings a claim for wrongful death pursuant

to the Illinois Wrongful Death Act, 740 Ill. Comp. Stat. 180/1 *et seq.*, against the Individual

Defendants, for *respondeat superior* against Lalley in her official capacity, and indemnification

against the City.  Defendants now move under Federal Rule of Civil Procedure 12(b)(6) to dismiss the Estate's amended complaint.

Because the Court finds that there is no constitutional right to be strip searched and that the Estate fails to allege sufficient facts to establish a failure to train *Monell* claim, the Court dismisses the Estate's § 1983 claim against Reuter, Mahan, and Diveley for failing to strip search Lankamer and its *Monell* claim.  Additionally, the Court dismisses the Estate's state law claims to the extent they rely on the theory that Lankamer's wrongful death occurred because of Reuter's Mahan's, and Dively's failure to strip search him because Section 4-103 of the Illinois Tort Immunity Act (the "ITIA") grants them immunity   The Estate may pursue its § 1983 claim against Davalos and Reuter for failure to provide medical care, as well as its state law claims on the same theory.

## BACKGROUND[1]

Around 8:30 p.m. on January 20, 2023, Mahan and Diveley stopped a vehicle for allegedly rolling through a stop sign shortly after its occupants engaged in what the officers suspected to be a hand-to-hand drug exchange.  Based on the smell of marijuana coming from the car and the suspicion of drug dealing, Mahan and Diveley instructed the occupants of the car to step out so they could search it.  The vehicle's occupants included twenty-year-old Lankamer and two other males.  Elgin police had arrested Lankamer three weeks earlier for unlawful marijuana possession by a minor, resisting arrest, and traffic citations.

While searching the car, Mahan and Diveley discovered three firearms, ammunition, a baggie later confirmed to contain cocaine, three torn plastic baggies consistent with individual

---

[1] The Court takes the facts in the background section from Lankamer's first amended complaint and presumes them to be true for the purpose of resolving Defendants' motion to dismiss.  *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013).

narcotics sales, and an empty alcohol container. The officers also found $4,877 in cash in Lankamer's pocket. After finding the money in Lankamer's pocket, a third officer, Shaun Schroeder, performed a pat down search over Lankamer's clothes. Schroeder did not find any additional contraband on Lankamer.

The officers arrested Lankamer along with the other occupants and took them to the Elgin Police Department. At 3:53 a.m. on January 21, 2023, Diveley performed a cursory search of Lankamer. Reuter and Mahan then booked Lankamer and placed him in a holding cell. Later that morning, the officers brought Lankamer to court for his bond hearing. However, the hearing was delayed until the next day to give Mahan and Diveley time to update their arrest report. The officers returned Lankamer to his holding cell at 10:27 a.m. on January 21, 2023, to remain until his bond hearing the following day.

For the next twelve hours, Davalos monitored Lankamer in his holding cell. Elgin Police Department policy required monitoring officers like Davalos to perform cell checks every thirty minutes, look for signs of life, and maintain a log of such checks including notes on the inmate. During cell checks from 1:56 p.m. to the end of her shift at 10:45 p.m., Davalos observed Lankamer sleeping in an identical position. At 6:49 p.m., Davalos delivered a meal to Lankamer's cell and knocked several times to try to wake him. Lankamer remained non-responsive. At 10:45 p.m., Davalos ended her shift and Reuter took over conducting the half-hour cell checks.

At 2:22 a.m. on January 22, 2023, Reuter removed the untouched meal from Lankamer's cell. By then, Lankamer had not eaten in the approximately thirty hours since his arrest. At 4:51 a.m., Reuter knocked on Lankamer's door and did not hear a response. Two minutes later, Reuter walked away from Lankamer's cell. At 4:54 a.m., Reuter returned to Lankamer's cell

3

and again tried to wake up Lankamer with no success. Reuter walked away from Lankamer's cell a second time. At 4:57 a.m., Reuter entered Lankamer's cell where he observed Lankamer lying on his back in bed with a pale face and vomit coming out of his mouth. Reuter left Lankamer's cell and called Officer Randy Fries to inform him that he found Lankamer unresponsive. Fries instructed Reuter to immediately request an ambulance.

Reuter returned to Lankamer's cell around 5:00 a.m. and performed a sternum rub. At 5:02 a.m., Fries and two other officers, Steve Alcorn and Katherine Kirsh, arrived at Lankamer's cell to render medical aid to Lankamer. Fries could not find a pulse, and Lankamer was not breathing. Fries and Alcorn again instructed Reuter to call for an ambulance. At 5:02 a.m., the Elgin Fire Department was called, while Fries and Alcorn administered Naloxone, attempted chest compressions, and attached an AED to Lankamer.

The paramedics arrived at 5:09 a.m. and declared Lankamer dead at 5:48 a.m. An autopsy later revealed two plastic baggies containing cocaine and fentanyl located in Lankamer's perineum. According to the Center for Disease Control, dermal exposure to fentanyl leads to absorption into the body over hours and days which can cause symptoms including reduced levels of consciousness, lethargy, hypoxia, coma and death. The Kane County Coroner determined that Lankamer died from a fentanyl overdose.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule

4

12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

### I.    Section 1983 Claims (Counts I–III)

The Estate brings three claims under § 1983—one against Reuter, Mahan, and Diveley for failing to strip search Lankamer when they brought him to the Elgin County Jail; one against Reuter and Davalos for failing to provide medical care to Lankamer while he remained unconscious for over twelve hours; and a claim against Lalley and the City under *Monell*. While the Estate originally pleaded its § 1983 claims as Fourteenth Amendment claims, both parties agree that the federal claims arise under the Fourth Amendment because Lankamer had not yet received a probable cause hearing. *See Pulera v. Sarzant*, 966 F.3d 540, 549 (7th Cir. 2020) ("Before a finding of probable cause, the Fourth Amendment protects an arrestee; after such a finding, the Fourteenth Amendment protects a pretrial detainee."). Given the parties' agreement, the Court will evaluate the Estate's claims under the Fourth Amendment.[2] The Fourth Amendment evaluates whether an officer's actions were objectively unreasonable under the circumstances. *Currie v. Chhabra*, 728 F.3d 626, 629 (7th Cir. 2013). The objective

---

[2] "[P]retrial confinement claims . . . whether characterized as arising under the Fourth or Fourteenth Amendment—are analyzed via the objective reasonableness standard." *Jump v. Vill. of Shorewood,* 42 F.4th 782, 793 (7th Cir. 2022).

unreasonableness standard applies both to claims relating to the conditions of confinement and medical care. *Id.*

### A.    Failure to Strip Search (Count I)

The Estate first asserts that Diveley, Mahan, and Reuter violated Lankamer's constitutional rights by failing to strip search him after his arrest. Diveley, Mahan, and Reuter move to dismiss, arguing that the Fourth Amendment does not require officers to strip search all arrestees.

To prevail on a § 1983 claim, the plaintiff must prove that "(1) he was deprived of a right secured by the Constitution or laws of the United States; and (2) the deprivation was visited upon him by a person or persons acting under color of state law." *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021). The Court must dismiss a § 1983 claim where the plaintiff experiences harm but fails to assert that the harm was caused by a right protected by the Constitution. *See Chavez v. Martinez*, 538 U.S. 760, 772 (2003) (finding that failure to read a suspect his *Miranda* rights, which is not a constitutional right but a prophylactic rule that protects an evidentiary ground, cannot be grounds for a § 1983 action); *Salem v. Att'y Registration & Disciplinary Comm'n of Supreme Ct. of Ill.*, 85 F.4th 438, 443 (7th Cir. 2023) (upholding dismissal of a § 1983 claim because "[f]reedom from being described as 'dishonest' (or the equivalent) by a state actor is . . . not a constitutional right of any kind"); *Keener v. Cork*, No. 24 C 201, 2024 WL 3508633, at *2 (N.D. Ind. July 19, 2024) (dismissing plaintiff's § 1983 claims in part finding that "there is no federal right to be consulted before probation revocation petitions are filed"); *King v. McGinnis*, No. 85 C 1260, 1986 WL 8044, at *2 (N.D. Ill. July 16, 1986) (dismissing § 1983 claim for unsafe working conditions because "the

Seventh Circuit . . . has determined that whatever Plaintiff's right may be with respect to safe working conditions, it is not a constitutional right").

The Estate asserts that Diveley, Mahan, and Reuter's failure to strip search him amounted to a violation of the Fourth Amendment. However, the Court has not found one case, nor has the Estate presented a case, that establishes that the Fourth Amendment requires officers to strip search a pretrial detainee to ensure the detainee's protection. Instead, the Fourth Amendment provides that officers *may* strip search an arrestee "when they have reasonable suspicion at the time of the search that he is concealing contraband on his body." *United States v. Logan*, 219 F. App'x 533, 535 (7th Cir. 2007). And courts regularly defer to the discretion of correctional officers to determine whether a strip search is necessary to maintain the safety and security of the facility. *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 326 (2012) ("Maintaining safety and order at these institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face."); *Peckham v. Wis. Dep't of Corr.*, 141 F.3d 694, 697 (7th Cir. 1998) (recognizing that while inmates have protection under the Fourth Amendment against unreasonable searches and seizures, "we hasten to add that given the considerable deference prison officials enjoy to run their institutions it is difficult to conjure up too many real-life scenarios where prison strip searches of inmates could be said to be unreasonable under the Fourth Amendment"). Allowing correctional officers to conduct a strip search when they have reasonable suspicion to do so does not amount to a constitutional guarantee that every arrestee must be strip searched before entering a jail to ensure the protection of the same arrestee.

The Estate attempts to overcome this deficiency pointing to examples where courts found that the plaintiff stated a failure to protect claim when a pretrial detainee or inmate died from a

drug overdose and the plaintiff asserted that the facility failed to properly address issues of overwhelming drug problems within the facility. *See Turner v. Cook Cnty. Sheriff's Off. by & through Dart*, No. 19 C 5441, 2020 WL 1166186, at *5 (N.D. Ill. Mar. 11, 2020); *Caraway v. CoreCivic of Tenn., LLC*, 98 F.4th 679, 684 (6th Cir. 2024). However, those examples are distinguishable because in *Turner* and *Caraway,* the plaintiffs alleged that the detainees had unfettered access to narcotics, that the defendants knew that the detainees had unfettered access to narcotics in the facilities, and that instead of conducting additional searches, the defendants ignored those risks. Here, the Estate alleged that Elgin as a city and jails in general have narcotics problems and face regular overdoses; it did not allege that Diveley, Mahan, or Reuter had knowledge of a massive drug problem at the Elgin jail that they chose to ignore. Such generalized knowledge does not amount to the specific information that the defendants in *Turner* or *Caraway* had about the facilities. As the *Caraway* Court underscored, "simple exposure to drugs . . . does not satisfy the objective prong" of a failure to protect claim. *Caraway*, 98 F.4th at 684. Additionally, while Lankamer had exposure to the drugs that he brought into the facility, his access does not amount to a constitutional violation committed by the officers who chose not to strip search him.

The Estate also attempts to establish that Diveley, Mahan, and Reuter violated Lankamer's constitutional rights by framing its claim as one for unreasonable conditions of confinement. However, even under a conditions of confinement theory, a plaintiff must allege that the conditions of confinement rise to the level of a constitutional violation. Under the Fourth Amendment, a plaintiff establishes a claim for unconstitutional conditions of confinement by showing that "the totality of the defendant's conduct in detaining the arrestee was 'objectively unreasonable' under the circumstances." *Saucedo v. City of Chicago*, No. 11 C 5868, 2015 WL

3643417, at *5 (N.D. Ill. June 11, 2015). The "caselaw in this Circuit suggests that a conditions of confinement claim must be tied, at least in part, to the physical conditions of the suspect's detention." *Walgren v. Heun*, No. 17-CV-04036, 2019 WL 265094, at *5 (N.D. Ill. Jan. 17, 2019). *Compare Lopez v. City of Chicago*, 464 F.3d 711, 720 (7th Cir. 2006) (deprivation of food, drink, and sleep for four days and nights could amount to a Fourth Amendment conditions of confinement claim), *abrogated on other grounds by Williams v. Dart*, 967 F.3d 625 (7th Cir. 2020), *and Sims v. Olszewski*, No. 17 C 0079, 2017 WL 1903121 at *5 (N.D. Ill. May 9, 2017) (an arrestee's prolonged exposure to cold in his cell was sufficient to state a claim for unconstitutional conditions of confinement because "basic human needs include shelter and heat"), *with Bradford v. City of Chicago*, No. 16 CV 1663, 2021 WL 1208958, at *8 (N.D. Ill. Mar. 31, 2021) (plaintiff did not state a conditions of confinement claim where the arrestee, who died from self-harm, had been "offered food, drink, and cigarettes and to use the restroom on multiple occasions while in Area 2, and the ERI recordings reflect that he was treated in a civil manner"). The Estate does not allege a physical condition of Lankamer's confinement; instead, its allegations rely on the incorrect argument that Lankamer had a Fourth Amendment right to a strip search. And as the Court has already concluded, the Fourth Amendment does not recognize the right to be strip searched, so Diveley, Mahan, and Reuter's failure to do so did not create an objectively unreasonable condition of confinement.

Therefore, the Court dismisses the Estate's failure to strip search claim. Because amendment of this claim would be futile, the Court dismisses the claim with prejudice. *See Stanard v. Nygren*, 658 F.3d 792, 800 (7th Cir. 2011) (finding refusal to allow amendment "eminently reasonable" when plaintiff failed to cure deficiencies in incomprehensible

complaint); *Anderson v. Deutsche Bank Nat'l Tr. Co.*, No. 14 C 5474, 2014 WL 6806891, at *2 (N.D. Ill. Dec. 2, 2014) (collecting cases).

    **B.**    **Failure to Provide Proper Medical Care (Count II)**

    The Estate also alleges that Reuter and Davalos violated Lankamer's Fourth Amendment rights by unreasonably depriving him of medical care when they failed to intervene even though he remained unresponsive in his cell for over twelve hours. To determine whether Reuter and Davalos' response to Lankamer's medical need was objectively unreasonable, the Court considers four factors: (1) whether the officers had notice of the condition; (2) the seriousness of the condition; (3) the scope of the requested solution; and (4) police interests, including "administrative, penological, or investigatory concerns." *Ortiz v. City of Chicago*, 656 F.3d 523, 530 (7th Cir. 2011); *Mahoney v. Monroe Cnty.*, No. 316 C 1312, 2017 WL 6513620, at *3 (S.D. Ill. Dec. 20, 2017) (applying these four factors at the motion to dismiss stage). The Court should also consider "the sufficiency of the steps that officers did take" as part of the Fourth Amendment reasonableness assessment. *Florek v. Vill. of Mundelein*, 649 F.3d 594, 600 (7th Cir. 2011).

    Reuter and Davalos focus their arguments on the first factor—whether they had notice of Lankamer's overdose. According to Reuter and Davalos, because they did not have knowledge that Lankamer consumed narcotics or that he had some stored on his body, they did not act unreasonably in not providing medical care earlier. While this argument may have legs at a later stage, at this point, the Estate has alleged sufficient facts that would have put Reuter and Davalos on notice that Lankamer suffered a serious medical ailment. *Cf. Alcorn v. City of Chicago*, No. 17 C 5859, 2018 WL 3614010, at *12 (N.D. Ill. July 27, 2018) ("In order to assess Plaintiff's allegations at this stage, the Court must focus on what each Individual CPD Defendant is alleged

to have known, by way of word or observation, about Lumar's mental state.").  The Estate alleges that Reuter and Davalos failed to provide medical care while on notice that Lankamer had been unresponsive for over twelve hours.  And, as courts widely recognize, "[f]ailure to breathe and failure to regain consciousness are undoubtedly life-threatening medical conditions that are obvious to a layperson."  *Snukis v. Taylor*, No. 21 C 00135, 2022 WL 2305697, at *7 (S.D. Ind. June 27, 2022) (quoting *Orlowski v. Milwaukee Cnty.*, 872 F.3d 417, 423 (7th Cir. 2017)).  The Estate also alleges that between 1:56 p.m. on January 21, 2023 and 4:47 a.m. on January 22, 2023, Lankamer did not move from the same position and failed to eat his dinner, despite not having eaten for nearly thirty hours.  Despite the lack of responsiveness from Lankamer over nearly eighteen-hour period, Reuter and Davalos did not enter Lankamer's cell to investigate his lack of responsiveness; instead, they only knocked on his door to attempt to get his response.  Drawing all inferences in the Estate's favor, it has sufficiently pleaded that Davalos and Reuter had notice that Lankamer required medical attention that they delayed.  *See Louden v. Carter*, No. 18 C 5242, 2021 WL 5882163, at *7 (N.D. Ill. Dec. 13, 2021) (denying motion to dismiss where plaintiff alleged obvious medical conditions that required medical attention); *Hobson v. Dominguez*, No. 10 C 429, 2012 WL 4361537, at *8 (N.D. Ind. Sept. 24, 2012) ("The Court finds that, as pled, the notice given to Defendant Pierce was of a condition— refusal to drink water—so obvious that even a lay person would perceive the need for Defendant Pierce's involvement whether or not such condition had ever been diagnosed.").

Reuter and Davalos next argue that the Court should dismiss the Estate's failure to provide medical attention claim because Reuter and Davalos are entitled to qualified immunity. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *White v.*

11

*Pauly*, 580 U.S. 73, 78 (2017) (citation omitted) (internal quotation marks omitted). "In other words, qualified immunity shields from liability police officers who act in ways they reasonably believe to be lawful." *Ewell v. Toney*, 853 F.3d 911, 919 (7th Cir. 2017) (quoting *Jewett v. Anders*, 521 F.3d 818, 822 (7th Cir. 2008)) (internal quotation marks omitted). Courts generally do not grant motions to dismiss on qualified immunity grounds because "an immunity defense usually depends on the facts of the case." *Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001); *see also Hanson v. LeVan*, 967 F.3d 584, 597 (7th Cir. 2020) ("The plausibility standard, which leads us to take as given the plaintiffs' allegations about the nature of their positions, is why 'a complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds.'" (quoting *Alvarado*, 267 F.3d at 651)). Plaintiffs also do not have an "obligation to initially anticipate and overcome a defense of qualified immunity in their complaint." *Hanson*, 967 F.3d at 597 (citation omitted) (internal quotation marks omitted). However, courts can evaluate qualified immunity arguments at the motion to dismiss stage "if the allegations in the complaint fail to state a claim of a clearly established right having been violated." *Id.* at 591; *see also Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 916 (7th Cir. 2015) ("[I]ndeed, we have reversed the denial of qualified immunity at the pleading stage where appropriate.").

By alleging that Lankamer had a Fourth Amendment right to medical attention in response to a serious medical condition, the Estate has alleged a clearly established right. *See Est. of Perry v. Wenzel,* 872 F.3d 439, 460 (7th Cir. 2017) (denying qualified immunity and determining that it was clearly established that the "the failure to take any action in light of a serious medical need" violated the Fourth Amendment); *Paine v. Cason*, 678 F.3d 500, 506 (7th Cir. 2012), *as amended on denial of reh'g and reh'g en banc* (May 17, 2012) ("Police must provide care for the serious medical conditions of persons in custody. That right is clearly

established."); *Snukis*, 2022 WL 2305697, at *7 (denying qualified immunity at the motion to dismiss stage because "it was clearly established that Snukis had a Fourth Amendment right to prompt medical attention in response to a serious medical condition"); *Acosta v. City of Chicago*, No. 15 C 8333, 2018 WL 3630011, at *7 (N.D. Ill. July 31, 2018) ("Here, the right is prompt access to medical care, and whether officers can deny or delay an arrestee's access to a hospital when faced with a serious need is beyond debate."). Here, the Estate alleged Reuter and Davalos failed to act when facing a serious medical need—namely, Lankamer's prolonged unresponsiveness. As such, the Court cannot find that qualified immunity protects Reuter and Davalos at this time and instead allows the claim to proceed to discovery.

### C. *Monell* Claim (Count III)

It has long been established that an individual cannot hold a municipality liable "*solely* because it employs a tortfeasor. *Monell*, 436 U.S. at 691. Instead, a municipality may be held liable for violating an individual's constitutional rights when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id*. at 694. To state a *Monell* claim, the Estate must allege (1) an express policy that, when enforced, causes a constitutional violation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law; or (3) a constitutional injury caused by a person with final policymaking authority. *McCormick v. City of Chicago,* 230 F.3d 319, 324 (7th Cir. 2000). The policy or practice "must be the direct

cause or moving force behind the constitutional violation." *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (citation omitted) (internal quotation marks omitted).

The Estate brings a failure to train claim against the City[3], alleging that the Elgin Police Department failed to institute and enforce policies to train officers on how to properly search and monitor detainees and respond to drug overdoses. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). To sufficiently assert a failure to train theory, the Estate must allege that the City's "failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.* at 389. Deliberate indifference exists where "the defendant (1) failed to provide adequate training in light of foreseeable consequences; or (2) failed to act in response to repeated complaints of constitutional violations by its officers." *Miranda v. Cnty. of Lake*, 900 F.3d 335, 345 (7th Cir. 2018). While "failure-to-train liability does not require proof of widespread constitutional violations before that failure becomes actionable," for "a single violation [to] suffice where a violation occurs" the Estate

---

[3] The Estate also sued Lalley under *Monell*. Defendants moved to dismiss Lalley, arguing that suing her in her official capacity is duplicative of suing the City. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). Although the Estate does not object, the Court notes that the Estate solely named Lalley as the defendant on its *respondeat superior* claim. The Court thus dismisses the *Monell* claim against Lalley with prejudice, with the parties agreeing that any such claim will proceed only against the City, but Lalley remains a named defendant for purposes of the *respondeat superior* claim. To the extent that the City, and not Lalley, is the proper defendant for that claim as well, the parties can agree to such a substitution.

must also assert "a recurring, obvious risk." *Flores v. City of S. Bend*, 997 F.3d 725, 731 (7th Cir. 2021).

To support its claim that there was a recurring, obvious risk of drug overdose at the Elgin jail, the Estate relies on the increasing rate of opioid overdoses in Illinois since 2013 and generalized statistics of drug overdoses in jails across the United States and in the Elgin community. However, these statistics are too general to allege a recurring, obvious risk at the Elgin jail. *Cf. Turner*, 2020 WL 1166186, at *4 (finding that the plaintiff sufficiently alleged a failure to train claim where he alleged that the jail was aware of, and publicly acknowledged, a persistent drug smuggling problem at the facility that resulted in several inmate overdoses and deaths and that the sheriff "failed to adequately train Jail staff on drug screening methods, inmate supervision, drug treatment, and drug overdose response" despite notice of the problem at the jail). Simply alleging that an opioid crisis exists in jails generally or even in Elgin does not allow the Court to infer the foreseeable consequences of that crisis required to state a claim for failure to train here. *See Strauss v. City of Chicago,* 760 F.2d 765, 769 (7th Cir. 1985) (upholding the dismissal of a *Monell* claim because the plaintiff only alleged statistical summaries of other arrests that "represent[ed] nothing more than generalized allegations" and "[bore] no relation to his injury"). And without any other allegations of a recurring, obvious risk of opioid overdose at the Elgin jail, the Estate has failed to state a failure to train claim against the City, and so the Court dismisses the claim.

## II.    State Law Claims (Counts IV-VI)

Defendants also move to dismiss the Estate's state law claims on the ground that the ITIA grants Defendants absolute immunity against such claims. Although immunity is an affirmative defense that the Estate need not have anticipated in the complaint, the Court may dismiss a claim

based on an affirmative defense where the plaintiff has pleaded itself out of court. *See Van Meter v. Darien Park Dist.*, 207 Ill. 2d 359, 373 (2003). Defendants argue that four different sections of the ITIA provide them with immunity. The Court addresses them in turn.

### A.    Section 4-103

Defendants first assert immunity under Section 4-103, which states that public employees shall not be liable "for failure to provide a jail, detention or correctional facility, or if such facility is provided, for failure to provide sufficient equipment, personnel, supervision or facilities therein. Nothing in this Section requires the periodic inspection of prisoners." 745 Ill. Comp. Stat. 10/4-103. In other words, Section 4-103 bars "claims grounded upon allegations of failing to safeguard [persons] while detained in jail." *Widdows v. Jackson Cnty.*, No. 22 C 200, 2024 WL 3636664, at *9 (S.D. Ill. Aug. 2, 2024) (quoting *Fraley v. City of Elgin*, 251 Ill. App. 3d 72, 77 (1993)). The immunity provided in Section 4-103 is absolute. *Payne for Hicks v. Churchich*, 161 F.3d 1030, 1044 (7th Cir. 1998). No exception for willful or wanton behavior exists under Section 4-103. *Bramwell v. Cortez*, No. 21 C 6219, 2022 WL 3586167, at *5 (N.D. Ill. Aug. 22, 2022).

Whether an immunity provision applies depends on the plaintiff's theory of liability. *See White v. Watson*, No. 16 C 560, 2018 WL 2047934, at *15 n.7 (S.D. Ill. May 2, 2018) (finding various provisions of the ITIA not applicable because "they provide immunity under theories not alleged in this case"). The section of the ITIA that applies to the theory is the one that is "more specific and is particularly applicable to the relation of the parties." *Bollinger v. Schneider*, 64 Ill. App. 3d 758, 761 (1978). Here, the Estate's state law claims rely on two theories of liability—first, that the Individual Defendants failed to adequately search and monitor Lankamer; and second, that the Individual Defendants failed to identify Lankamer's medical needs and

16

address those accordingly.  The Estate alleges that the Individual Defendants' failure to search Lankamer allowed him to harm himself by overdosing.  Other courts have found that Section 4-103 extends immunity to defendants where the plaintiff alleges that the officers created an environment that allowed an individual to harm himself.  *See Payne*, 161 F.3d at 1044 (granting defendants alleged to have failed to protect inmates from self-inflicted harm immunity under Section 4-103); *Widdows*, 2024 WL 3636664, at *10 (finding "the plaintiff's claim that the defendants were liable for the detainee's suicide based on their failure to safeguard the jail from such events fit squarely within the scope of section 4-103").  While the Estate asserts that Section 4-103 should not govern here because it does not specifically address an officer's ability to strip search an arrestee, such a narrow interpretation of the immunity provision does not follow how courts have understood Section 4-103 to apply.  *See Widdows*, 2024 WL 3636664, at *10 ("Section 4-103 broadly provides immunity from claims based on the operation and supervision of a jail.").  Accordingly, Section 4-103 provides the Individual Defendants with immunity to the extent that the Estate seeks to recover for Lankamer's wrongful death because they failed to strip search him.[4]

That said, Section 4-103 does not dispose of the Estate's second theory, that the Individual Defendants failed to address Lankamer's medical needs.  Section 4-103 does not provide immunity for defendants who had actual knowledge of an arrestee's medical needs and willfully denied him medical treatment.  *See Thomas ex rel. Smith v. Cook Cnty. Sheriff*, 401 F. Supp. 2d 867, 876 (N.D. Ill. 2005) (collecting cases).  Instead, as the Estate notes, its claims arising from the Individual Defendants' failure to provide proper medical care to Lankamer fall

---

[4] Defendants also asserted Section 2-201 provided them with immunity as to the Estate's claims relating to the Individual Defendants' failure to strip search Lankamer.  Because the Court finds Defendants are entitled to immunity with respect to those claims under Section 4-103, it does not address Section 2-201.

within another immunity provision—Section 4-105. Section 4-105 states that "[n]either a local public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody" and excludes from immunity the instance where "the employee, acting within the scope of his employment, knows from his observation of conditions that the prisoner is in need of immediate medical care and, through willful and wanton conduct, fails to take reasonable action to summon medical care." 745 Ill. Comp. Stat. 10/4-105. Because Section 4-105 applies to allegations of correctional officers failing to provide proper medical care, it applies to the Estate's state law claims that the Individual Defendants failed to identify Lankamer's medical emergency and provide treatment. And because the Court has already found that the Estate has sufficiently alleged deliberate indifference as to his failure to provide medical care claim, it has sufficiently alleged willful and wanton behavior, and thus the Individual Defendants are not entitled to immunity under 4-105 at this time. *See Turner*, 2020 WL 1166186, at *7 ("The willful and wanton standard in § 4-105 is substantially the same as the deliberate indifference standard for certain § 1983 claims." (citing *Chapman v. Keltner*, 241 F.3d 842, 847 (7th Cir. 2001))).

### B.   Section 4-102

Defendants also seek immunity under Section 4-102, which provides immunity to public entities for "failure to provide adequate police protection or service, failure to prevent the commission of crimes, failure to detect or solve crimes, and failure to identify or apprehend criminals." 745 Ill. Comp. Stat. 10/4-102. The Estate argues that Section 4-102 does not apply here because it does not specifically address claims arising from jails. Because the Illinois Appellate Courts counsel that the more specific immunity section should apply, Section 4-102 does not govern the Estate's claims, because they are properly addressed under Section 4-105.

18

*See Turner*, 2020 WL 1166186, at *6 (applying Section 4-103 and declining to apply Section 4-102 where the plaintiff's injury occurred while he was incarcerated).

### C.    Section 6-105

Finally, Defendants argue that Section 6-105 provides the Individual Defendants with immunity relating to the Estate's claim that Defendants failed to identify that Lankamer needed medical attention.  Section 6-105 states that:

> Neither a local public entity nor a public employee acting within the scope of his employment is liable for injury caused by the failure to make a physical or mental examination, or to make an adequate physical or mental examination of any person for the purpose of determining whether such person has a disease or physical or mental condition that would constitute a hazard to the health or safety of himself or others.

745 Ill. Comp. Stat. 10/6-105.

The Estate asserts that Section 6-105 does not apply to the Individual Defendants because it does not extend to situations where the Individual Defendants failed to react to a known condition, namely that Lankamer was unresponsive.  "Section 6–105 speaks to liability flowing from a failure to examine, not to a failure to react to injuries that are patent."  *Alvarez v. Riesche*, No. 98 C 5552, 1999 WL 519383, at *10 (N.D. Ill. July 12, 1999); *see also Awalt v. Marketti*, 74 F. Supp. 3d 909, 943 (N.D. Ill. Nov. 24, 2014) (finding Section 6-105 did not apply where plaintiff's alleged "a failure to address patent medical conditions whether because the symptoms were obvious or the detainees told the Jail staff that they suffered from certain conditions" and not "that the lack of medical examination per se caused [plaintiff's] death"), *supplemented*, 75 F. Supp. 3d 777 (N.D. Ill. Dec. 8, 2014).  Because the Estate alleged that the Individual Defendants knew that Lankamer was unresponsive for over twelve hours without the Individual Defendants

19

providing any medical care, Section 6-105 does not grant immunity to Defendants as to the Estate's claims for failure to provide medical care to Lankamer.

In sum, the Court dismisses the Estate's claims against Reuter, Mahan, and Diveley as to the theory that they failed to strip search Lankamer. The Estate may proceed on its § 1983 and wrongful death claims against Davalos and Reuter, its *respondeat superior* claim against Lalley, and its indemnification claim against the City on the theory that Davalos and Reuter failed to provide Lankamer medical care.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion to dismiss [16]. The Court dismisses with prejudice the Estate's failure to protect claim for failing to strip search Lankamer (Count I). The Court dismisses without prejudice the Estate's *Monell* claim against the City (Count III). The Court also dismisses the Estate's state law claims to the extent that they rely on the theory that Reuter, Mahan, and Diveley failed to strip search Lankamer because Section 4-103 of the ITIA bars such claims. Finally, upon agreement of the parties, the Court dismisses with prejudice the *Monell* claim brought against Lalley in her official capacity.


Dated: [September 9, 2024

_____
SARA L. ELLIS
United States District Judge